**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 19-4560**

UNITED STATES OF AMERICA,

        Plaintiff − Appellee,

   v.

BOBBY JOHN KOBITO,

        Defendant – Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  N. Carlton Tilley, Jr., Senior District Judge.  (1:19-cr-00025-NCT-1)

Argued:  December 11, 2020             Decided:  April 21, 2021

Before GREGORY, Chief Judge, and KING and DIAZ, Circuit Judges.

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Chief Judge Gregory and Judge King joined.

**ARGUED:**  Lisa S. Costner, LISA S. COSTNER, PA, Winston-Salem, North Carolina, for Appellant.  Ashley E. Waid, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  Matthew G.T. Martin, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

DIAZ, Circuit Judge:

Bobby Kobito pleaded guilty to knowingly possessing an unregistered silencer and was sentenced to 60 months' imprisonment. He now appeals that sentence, challenging the district court's use of two enhancements under the United States Sentencing Guidelines Manual ("USSG"): § 3A1.4 for committing a felony intended to promote terrorism, and § 2K2.1(b)(6)(B) for possessing a firearm with the intent that it be used in connection with another felony, here "Felony Terroristic Threats."

Kobito contends that the enhancements shouldn't apply because he couldn't be convicted of the underlying terrorism felonies. But Kobito need not be convicted of a terrorism felony for § 3A1.4 to apply, and the district court didn't clearly err by including it in Kobito's Guidelines calculation. As a result, § 2K2.1(b)(6)(B) has no impact on the length of Kobito's sentence, rendering any alleged error as to its application harmless. We thus affirm the district court's judgment.

I.

A.

When Kobito entered a mosque in Raleigh, North Carolina to ask about an inflammatory video of an Imam that was circulating on social media, a local police officer took notice. The officer then walked by Kobito's car and spotted binoculars and shooting targets inside. A subsequent investigation led to Kobito's Facebook account, which included statements such as "One Man's Terrorist is Another Man's Patriot." J.A. 62, 131. The Federal Bureau of Investigation ("FBI") then directed a confidential informant to

2

contact Kobito and learn whether he was planning any criminal acts aimed at the mosque. When the informant messaged him on Facebook, Kobito suggested meeting in person.

The two men met at a restaurant and the informant recorded the conversation. Kobito told the informant that he believed the state's fusion center,[1] located inside the Terry Sanford Federal Building in Raleigh, was a front for the "National Security Administration."[2] J.A. 18. Kobito explained that he "need[ed] to find the exact floor, [to] dump shots into the building," described three positions from which he could fire into the building, and discussed the measures he would take to cover his tracks. J.A. 19. Kobito then said:

> I've been doing this, like I said for about ten years now, hardcore about the last six. I've got my (inaudible) that I've sniperized so it's ten round fed magazine. And freaking, they call it a solvent trap adapter, this company makes. And it's patented, it's completely legal to own. It freaking has threads for, ahh, an oil filter. Poor man's silencer . . . Where do you buy your silencer? I go down to a fucking auto store . . . And the shit works. Um, I used it, I snuck it one time at the range. Because I wanted to verify the other can that I created . . . It takes a 7.62 x (inaudible) round to where it's not much louder than a .22.

J.A. 20–21.

After the meeting, Kobito emailed the informant a photograph of the Terry Sanford Federal Building and a document titled "Patriots Against Tyrants," which described Kobito's grievances against the government. J.A. 21.

---

[1] Fusion centers are state-owned and operated hubs where federal, state, local, and tribal law enforcement agencies share information.

[2] It appears Kobito meant to refer to the National Security Agency.

Kobito next met the informant about three weeks later at a gun range. He identified the FBI, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the Department of Homeland Security buildings as potential targets. Kobito told the informant, "Evil is coming and we need to be proactive and try to disrupt the plans." *Id.*

The following day, Kobito texted the informant that he wasn't sure if he could personally execute the plan due to his age and health, so the informant should find someone else to help carry it out. But Kobito reaffirmed that the plan was "something that is needed" and stated that he remained willing to assist with planning and training. *Id.*

The informant met with Kobito for the final time a few months later and again recorded their conversation. Kobito told the informant that he still intended to do what they previously discussed. When the informant expressed concerns about the gun shots making too much noise, Kobito said:

> Where I bought most parts from the guy, that I put on it you know. It just clamps on like a bayonet would, you know? So instead of that, he got what he calls a uh, calls it a muzzle-trap or something trap. And it clamps on just like the bayonet or the muzzle brake.

J.A. 22. The informant asked, "So it's like a silencer?" *Id.* Kobito responded:

> No. It's frickin, just a little clamp thing you screw on a frickin oil filter . . . So, I've got two STPs. Went down to my local, uh, was it NAPA or frickin AutoZone? I can't remember which. Frickin that's where I bought my silencers for $8 a piece. Frickin drilled a hole, and it . . . takes that big ass round and drops it below a .22. And that is no shit. So, for me, noise isn't a factor utilizing that particular gun.

*Id.*

A few months later, the informant contacted Kobito and said he was "[s]till worried about the noise." *Id.* Kobito replied that his thoughts hadn't changed. The informant then

4

asked whether Kobito still had the "device [they] talked about to help with noise," to which Kobito said, "Yes." *Id.* But when the informant asked to test the silencer, Kobito replied, "Getting bad vibes man. Told you how it was made & works! Let's part ways for now. I wish you the best of luck in all you do! In Liberty, Bob." J.A. 22–23. Kobito didn't respond to further attempts by the informant to contact him.

The government ultimately executed a search warrant at Kobito's home and found two silencers made from oil filters.

B.

A federal grand jury indicted Kobito for knowingly possessing an unregistered silencer in violation of 26 U.S.C. §§ 5861(d) and 5871.[3] Kobito pleaded guilty pursuant to a plea agreement. The probation officer then prepared a Presentence Investigation Report and recommended the application of two enhancements.

First, the probation officer applied a twelve-level enhancement under USSG § 3A1.4 for "a felony that involved, or was intended to promote, a federal crime of terrorism." A "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5) as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of an enumerated statute. Here, that statute is 18 U.S.C. § 1363, which punishes anyone who "willfully and

---

[3] Under these statutes, it's unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record," 26 U.S.C. § 5861(d), and any person in violation may "be imprisoned not more than ten years," *id.* at § 5871. The definition of "firearm" includes "any silencer." *Id.* at § 5845(a).

maliciously destroys or injures any structure, conveyance, or other real or personal property, or attempts or conspires to do such an act" so long as the property is "within the special maritime and territorial jurisdiction of the United States."

Second, the probation officer applied a four-level enhancement under USSG § 2K2.1(b)(6)(B) for possession of a firearm "with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense," which she called "Felony Terroristic Threats." J.A. 134–35.

The enhancements resulted in a Guidelines sentence of 188–235 months' imprisonment, capped at the statutory maximum of 120 months. Kobito objected to both enhancements, arguing that he made "no terroristic threat," did "not commit or plan a terrorist act," and "withdrew from any and all conversation with the [informant] prior to being charged." J.A. 126. The court overruled Kobito's objections, but varied downward and sentenced him to 60 months in prison.

This appeal followed.

## II.

Kobito now expands on his argument that the district court erred by enhancing his Guidelines range using USSG §§ 3A1.4 and 2K2.1(b)(6)(B) because he couldn't be convicted of the underlying terrorism felonies. He contends that the government didn't prove that the Terry Sanford Federal Building was "within the special maritime and territorial jurisdiction of the United States," as required by 18 U.S.C. § 1363, and that his

conduct was mere "hyperbolic talk" rather than an attempt or conspiracy to commit terrorism or to issue terroristic threats.  Appellant's Br. at 16.

As we explain, we review Kobito's new jurisdictional argument for plain error and find none.  We also conclude that § 3A1.4 applies even if the defendant couldn't be convicted of a federal crime of terrorism, and so the district court properly used it to enhance Kobito's sentence.  This renders harmless any alleged error in applying § 2K2.1(b)(6)(B) because, even without that enhancement, the statutory maximum would cap the Guidelines range.

## A.

We review criminal sentences only "to determin[e] whether they are reasonable." *Gall v. United States*, 552 U.S. 38, 46 (2007) (cleaned up).  On a challenge to a district court's Guidelines calculations, we review legal conclusions de novo, factual findings for clear error, unpreserved arguments for plain error, *United States v. Strieper*, 666 F.3d 288, 292 (4th Cir. 2012), and preserved arguments for harmless error, *United States v. Lynn*, 592 F.3d 572, 576 (4th Cir. 2010).  Before a district court can enhance a defendant's Guidelines range, the government must prove by a preponderance of the evidence that the enhancement applies. *United States v. Steffen*, 741 F.3d 411, 414 (4th Cir. 2013).

## B.

We first turn to the § 3A1.4 enhancement.  Recall that this enhancement applies when "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."  USSG § 3A1.4.  And the enumerated crime at issue, 18 U.S.C. § 1363,

prohibits the "attempt[] or conspir[acy]" to "willfully and maliciously destroy[] or injure[]" property "within the special maritime and territorial jurisdiction of the United States."

Kobito argues that the enhancement shouldn't apply to his sentence because the government (1) didn't prove that the Terry Sanford Federal Building was within the special territorial jurisdiction of the United States, and (2) didn't and couldn't have shown that Kobito attempted or conspired to destroy that building. We disagree.

The special territorial jurisdiction of the United States is defined, in relevant part, as "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof." 18 U.S.C. § 7(3). But "[i]t is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction," 40 U.S.C. § 3112(c), "by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated," *id.* at § 3112(b).

Kobito says that the government didn't prove it had affirmatively accepted jurisdiction over the Terry Sanford Federal Building. Instead, in response to Kobito's objections to the Presentence Investigation Report, the probation officer simply asserted that the Terry Sanford Federal Building is within the territorial jurisdiction of the United States, after which the district court referred to the building as "property within the territorial jurisdiction of the United States." J.A. 70. Because Kobito never raised this issue in the district court, plain-error review applies.

Even assuming the government was required to prove that the Terry Sanford Federal Building is under the special territorial jurisdiction of the United States—which, as we

8

explain, it was not—the district court didn't err by applying the enhancement. Kobito doesn't seriously contest that the building is under federal jurisdiction. And he concedes that this court could "probably" take judicial notice of federal jurisdiction over the building, Oral Argument at 14:25–32. As a result, the district court didn't plainly err in assuming the same.

Regardless, the government wasn't obligated to prove that the building is within the special territorial jurisdiction of the United States, because the § 3A1.4 enhancement doesn't require that a defendant be convicted of a federal crime of terrorism. Instead, the enhancement applies whenever a defendant's offense of conviction or relevant conduct was "intended to promote" a federal crime of terrorism, even if it didn't "involve" such a crime.

In reaching this conclusion, "[w]e interpret the Sentencing Guidelines using our ordinary tools of statutory construction." *United States v. Ward*, 972 F.3d 364, 369 (4th Cir. 2020). As in all cases of statutory interpretation, "we start with the plain text of the Guidelines and assume that the ordinary meaning of the statutory language controls." *Id.* (cleaned up).

Again, § 3A1.4 applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." The word "or" is "almost always disjunctive, that is, the words it connects are to be given separate meanings." *Loughrin v. United States*, 573 U.S. 351, 357 (2014). The disjunctive phrase in § 3A1.4 thus "makes clear that the predicate offense must either (1) 'involve' a federal crime of terrorism or (2) be 'intended to promote' a federal crime of terrorism, and that each clause has a separate meaning." *United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010).

9

The dictionary defines "involve" as "to have within or as part of itself." *Involve*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/involve (last visited April 20, 2021). The "involve" prong therefore suggests that the predicate offense and related conduct must include a federal crime of terrorism. *See, e.g., United States v. Chandia*, 675 F.3d 329, 331–32 (4th Cir. 2012) (applying the terrorism enhancement to a defendant convicted of a terrorism offense listed in 18 U.S.C. § 2332b(g)(5)); *United States v. Hammoud*, 483 F. App'x 865, 867 (4th Cir. 2012) (same).

But the use of the disjunctive means that "the 'intended to promote' prong must be applicable in some circumstances when the 'involved' prong is not, *i.e.*, where the defendant's offense or relevant conduct does *not* include a federal crime of terrorism." *Awan*, 607 F.3d at 314. The dictionary defines "intend" as "to have in mind as a purpose or goal." *Intend*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/intend (last visited April 20, 2021). And it defines "promote" as "to help bring (something, such as an enterprise) into being." *Promote*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/promote (last visited April 20, 2021).

Put together, the ordinary meaning of the "intended to promote" prong is that the enhancement applies whenever the defendant commits a felony with "a goal or purpose . . . to bring or help bring into being a crime listed in 18 U.S.C. § 2332b(g)(5)(B)," *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004), even if the defendant "has not necessarily completed, attempted, or conspired to commit the crime," *United States v.*

10

*Graham*, 275 F.3d 490, 516 (6th Cir. 2001).[4] *See also United States v. Benkahla*, 530 F.3d 300, 311–13 (4th Cir. 2008) (applying the § 3A1.4 enhancement to the defendant's sentence for obstructing an investigation into a terrorism crime listed in 18 U.S.C. § 2332b(g)(5)(B)).

That definition of the "intended to promote" prong dooms Kobito's argument that he couldn't be convicted of violating 18 U.S.C. § 1363 because the government didn't proffer evidence that the Terry Sanford Federal Building is actually within the special territorial jurisdiction of the United States (or for that matter, because Kobito couldn't be convicted of an attempt or conspiracy to destroy that building). Instead, "it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered." *Mandhai*, 375 F.3d at 1248.

More specifically, the district court had to find by a preponderance of the evidence that Kobito committed the crime of conviction (possessing unregistered silencers) with the intent to promote "willful[] and malicious[] destr[uction]" of property under federal jurisdiction, 18 U.S.C. § 1363, and in a manner that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government

---

[4] This interpretation stands in good company. In addition to the Second, Sixth, and Eleventh Circuits, the Fifth and Seventh Circuits have also read the "intended to promote" prong similarly. *See, e.g.*, *United States v. Fidse*, 862 F.3d 516, 522 (5th Cir. 2017) ("[T]he phrase implies that the defendant *has as one purpose* of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism." (quoting *Graham*, 275 F.3d at 516)); *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005) ("We find, therefore, that § 3A1.4 must be considered . . . when a defendant's felony conviction or relevant conduct has as one purpose the intent to promote a federal crime of terrorism.").

conduct," 18 U.S.C. § 2332b(g)(5)(A)—regardless of whether he actually took steps to destroy federal property. The court did so. *See* J.A. 70 ("[I]t is pretty obvious from what took place and what was said, that there was an intent to influence or affect the conduct of the government, to retaliate against the government, and it was in a way which would be to destroy property within the territorial jurisdiction of the United States.").

And on this record, the district court's finding wasn't clearly erroneous. The court determined that Kobito intended to promote the destruction of federal property when he named the Terry Sanford Federal Building as a target. The court also found that Kobito obtained (and suggested using) his unregistered silencers to facilitate those attacks, as established by the conversations recorded by the informant. And the court relied on the "Patriots Against Tyrants" manifesto and Kobito's statement that he would "disrupt the plans" of evil as evidence of his intent to influence by intimidation (or retaliate against) the government. Because we see no "obvious error or mistake" in the court's reasoning, we affirm its application of the § 3A1.4 enhancement. *See United States v. Ward*, 171 F.3d 188, 191 (4th Cir. 1999).

## C.

We next turn to the USSG § 2K2.1(b)(6)(B) enhancement, which applies when the defendant "used or possessed any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." A defendant possesses a firearm "in connection with" another offense if the firearm "facilitated, or had the potential of facilitating, another felony offense." *Id*. at cmt. n.14(A).

The probation officer proposed that the predicate offense be "Felony Terroristic Threats" without citing to any statute defining that crime. J.A. 134–35.

The government attempted to provide an alternate predicate offense, contending that "the enhancement could also be applied on the basis that the defendant's possession of the silencers facilitated, or had the potential to facilitate a violation of 18 U.S.C. § 1363." J.A. 159 (Gov't's Position with Respect to Sentencing Factors). But the district court never clarified why it applied the enhancement. *See* J.A. 70 (concluding that Kobito violated 18 U.S.C. § 2332(g)(5), "as well as a couple of those other statutes," so "both enhancements are appropriate."). Reflecting the confusion over the predicate offense, Kobito argues that § 2K2.1(b)(6)(B) doesn't apply because he couldn't have been convicted of conspiracy or attempt to violate § 1363, and because his statements don't qualify as "true threats" that are unprotected by the First Amendment or would violate 18 U.S.C. § 2332b.

Fortunately, we need not decide whether the district court erred in applying § 2K2.1(b)(6)(B). Rather, we may "assume that a sentencing error occurred and proceed to examine whether the error affected the sentence imposed." *United States v. Hargrove*, 701 F.3d 156, 161 (4th Cir. 2012).

Here, even if we remove the § 2K2.1(b)(6)(B) enhancement from the calculations, the Guidelines range would remain the same. Kobito's offense level would drop from 31 to 27, but his criminal history category would remain a VI, resulting in a range that exceeds the statutory maximum of 120 months. *See* USSG ch. 5, pt. A (Sent'g Table). Because § 2K2.1(b)(6)(B) has no impact on the Guidelines range, any error in the application of the enhancement is harmless.

13

\* \* \*

For these reasons, the district court's judgment is

*AFFIRMED.*