**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 22-4258**

───────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JEFFREY M. REED,

Defendant – Appellant.

───────────

Appeal from the United States District Court for the Southern District of West Virginia, at Bluefield.  David A. Faber, Senior District Judge.  (1:20-cr-00066-1)

───────────

Argued:  March 10, 2023                          Decided:  July 31, 2023

───────────

Before WILKINSON, HARRIS, and RUSHING, Circuit Judges.

───────────

Affirmed by published opinion.  Judge Rushing wrote the opinion, in which Judge Wilkinson and Judge Harris joined.

───────────

**ARGUED:**  David Robert Bungard, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  Erik S. Goes, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:**  Wesley P. Page, Federal Public Defender, Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  William S. Thompson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

───────────

RUSHING, Circuit Judge:

A jury convicted Jeffrey M. Reed of two crimes arising out of an elaborate ploy to intimidate an Internal Revenue Service (IRS) agent into halting her efforts to collect his delinquent tax debt. On appeal, Reed challenges the validity of both convictions along with three enhancements the district court imposed at sentencing. We affirm.

I.

Reed owed the IRS a substantial amount in past-due taxes. After the IRS's ordinary collection efforts failed, the agency transferred Reed's case to its Abusive Tax Avoidance Transactions division, a specialized unit that handles difficult cases involving tax avoiders and repeat offenders. An IRS agent using the agency-approved pseudonym T.L. Blake was assigned to pursue Reed's case. Initially, Blake sent Reed a collection letter and attempted to visit him at home, but to no avail. Blake also sent a notice of levy to Reed's employer, the Holiday Lodge & Conference Center in Oak Hill, West Virginia, directing the hotel to garnish Reed's wages. When the Holiday Lodge did not respond, Blake traveled to West Virginia and visited the hotel. There, she served a final notice of levy directing the hotel to begin garnishing Reed's wages or risk facing a penalty.

The hotel's owner, Sara Nelson, decided to comply with Blake's directive and garnish Reed's wages. When Nelson told Reed her intentions, Reed became upset and tried to convince Nelson to send a letter on his behalf, written by him, challenging the garnishment. In one of Reed's draft letters, he included a thinly veiled threat to sue Nelson if she garnished his wages. Nelson declined to send a letter for Reed, garnished his wages,

2

and soon fired him because of his hostility toward her and threat to sue her. She garnished approximately $600 from one of Reed's paychecks.

Around the same time, Reed mailed back to the IRS copies of documents Blake had served on the hotel and mailed to Reed. In an accompanying letter, Reed claimed the documents were instruments good for the value of his debt. Frivolous avoidance tactics like this were not new to Reed. Years prior, in 2013, the IRS sent Reed a letter warning him against such conduct. Blake referred the mailing to the IRS's Frivolous Return Unit, which handles such correspondence.

In response to Blake's attempts to collect his taxes, Reed filed a lien and various related documents against Blake and Nelson with the Mercer County, West Virginia clerk alleging the two owed him nearly $5 million arising from 165 constitutional violations they supposedly committed against him. Reed then recorded financing statements purporting to perfect security interests in the lien. The financing statements listed Nelson and Blake as lien debtors and asserted that Reed, as the creditor, had a security interest in their real and personal property because of the supposed debt. Reed recorded one financing statement against Blake in Maryland and one against Nelson in West Virginia, the latter of which he twice amended. Before he filed the lien and related documents, Reed sent "courtesy notices" of some of these documents to IRS officials on at least three occasions to apprise them of "the legal action" he was taking against Blake. J.A. 460. He also sent

3

letters to insurance commissioners in several States complaining that Blake and Nelson had not provided bonding information to cover the amount alleged in the lien.[1]

When Blake learned of the financing statement Reed had filed against her, she referred it to the Treasury Inspector General for Tax Administration, which investigated the filing. As part of the investigation, two officers interviewed Reed, who voluntarily spoke with them at his home. Reed admitted creating and filing the lien and financing statement against Blake, acknowledged receiving the 2013 letter warning him against frivolous tax-avoidance tactics, and initialed each document. Reed explained he developed the strategy to file a lien and financing statement by "talk[ing] to individuals and research[ing] it on the internet and that [he] had concluded that this was going to be the only way he could get the IRS to leave him alone." J.A. 151. Although Reed disclaimed an intention to try to enforce the lien, he told the officers he could enforce it "at any time" and that the filings "would not go away without him signing off, or making them go away, that they would exist continuously"; he also acknowledged that the filings could impact Blake's credit score and ability to obtain credit. J.A. 152.

Although Reed never attempted to enforce the lien, his filings negatively impacted both Blake and Nelson. When Blake tried to purchase a home, she had to list her pseudonym as an alias on her mortgage application. The lender then found Reed's lien, requiring Blake to undertake significant efforts to clear up the matter to complete her

---

[1] Reed also sent Blake and two other IRS officials a notice alleging Blake had violated a copyright Reed supposedly owns in his name and owed him $9 million in damages.

4

purchase.  As for Nelson, she perceived the lien and financing statement to be a serious threat to her business and was afraid Reed would try to take the hotel from her.  She later reemployed Reed as an independent contractor when she needed additional maintenance staff, reasoning that repairing their relationship might convince him to void the lien.

In May 2020, a grand jury charged Reed with filing or attempting to file a false lien or encumbrance against a federal employee in violation of 18 U.S.C. § 1521.  Reed moved to dismiss, arguing that because he filed the lien against the IRS agent's pseudonym, T.L. Blake, he did not file it against an "individual" as required under Section 1521.  The district court denied the motion, concluding the indictment was sufficient and Reed's arguments on the merits were premature.  The grand jury later returned a superseding indictment that maintained the Section 1521 charge (Count 1) and added a charge for attempting to interfere with the administration of internal revenue laws in violation of 26 U.S.C. § 7212(a) (Count 2), and the case proceeded to trial.

When the Government concluded its case-in-chief, Reed moved for a judgment of acquittal.  The district court reserved ruling on the motion, and the jury convicted Reed on both counts.  At sentencing, the court denied Reed's motion for acquittal and explained the decision in a written order.  The court overruled Reed's objections to various sentencing enhancements and sentenced Reed to 60 months' imprisonment on Count 1 and 36 months' imprisonment on Count 2, to run concurrently, followed by 3 years of supervised release. Reed appealed, and we have jurisdiction under 28 U.S.C. § 1291.

5

II.

Reed contests the sufficiency of the evidence supporting his convictions on both counts. Viewing the evidence in the light most favorable to the Government, we will uphold a conviction if substantial evidence supports the jury's verdict. *See United States v. Mathis*, 932 F.3d 242, 258 (4th Cir. 2019). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Hackley*, 662 F.3d 671, 678 (4th Cir. 2011) (internal quotation marks omitted). We do not "assess witness credibility," and we presume "that the jury resolved any conflicting evidence in the prosecution's favor." *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018) (internal quotation marks omitted). A defendant "bears a heavy burden" to justify reversal under this standard. *Id.* (internal quotation marks omitted).

A.

Count 1 of the superseding indictment charged Reed with filing and attempting to file a false lien or encumbrance against Blake in retaliation for her efforts to collect his past-due taxes. At trial, the Government rested on the theory that Reed attempted to file a false lien against the IRS agent who was working to collect his overdue taxes and only failed to complete the crime because he used Blake's pseudonym instead of her real name on the lien. The jury accepted that argument. On appeal, Reed contends that his attempt conviction is invalid because he filed the lien against a pseudonym, and so he did not attempt to file it against an "individual," as required under Section 1521. We disagree.

6

Section 1521 of Title 18 makes it unlawful to "file[], attempt[] to file, or conspire[] to file, in any public record . . . , any false lien or encumbrance against the real or personal property of an individual described in section 1114, on account of the performance of official duties by that individual, knowing or having reason to know that such lien or encumbrance is false or contains any materially false, fictitious, or fraudulent statement or representation."   An "individual described in section 1114" includes "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services)" as well as "any person assisting such an officer or employee."   18 U.S.C. § 1114(a).   Congress enacted Section 1521 to prevent attempts to harass and intimidate federal employees in the exercise of their official duties by filing false liens or encumbrances. *See United States v. Neal*, 776 F.3d 645, 653 (9th Cir. 2015); *United States v. Reed*, 668 F.3d 978, 981 (8th Cir. 2012).

Because Section 1521 covers attempts and conspiracies, "the statute is not confined to completed acts" and "can be violated without completed conduct." *Neal*, 776 F.3d at 653; *see United States v. Jordan*, 851 F.3d 393, 397–398 (5th Cir. 2017).   To obtain a conviction on an attempt theory, the Government had to prove that (1) Reed "had culpable intent to commit the crime" and (2) "he took a substantial step towards completion of the crime that strongly corroborates that intent." *United States v. Engle*, 676 F.3d 405, 419–420 (4th Cir. 2012).

The evidence against Reed on Count 1 was overwhelming.   Reed admitted to Treasury Department investigators that he developed his scheme as "retaliation for the [IRS] going after him" and with the intent "to get the IRS to leave him alone."   J.A. 151,

7

182. He then took steps to carry out his plan by filing a lien and related financing statement against Blake, a federal IRS agent, alleging a nearly $5 million debt. Reed candidly admitted to investigators that he was responsible for these filings and acknowledged that they could harm Blake's credit score and ability to obtain credit. The allegations Reed included in the lien itself leave no doubt he created and recorded the instrument in retaliation for Blake's enforcement actions. And the jury could conclude that Reed knew or had reason to know the lien was fraudulent, given the arbitrariness of the debt calculation, the absence of any credible support for it, and Blake's testimony that she owed Reed nothing.

Despite this evidence against him, Reed argues that he did not attempt to file a false lien or encumbrance against an "individual" within the meaning of Section 1521 because he filed the lien against "T.L. Blake," the IRS agent's pseudonym. According to Reed, the statute does not apply to fictitious persons and his mistake about Blake's real name precludes criminal liability.

We agree with the district court that Reed's argument misses the mark because he attempted to file the lien against the property of a real federal employee. Even accepting Reed's definitions of "individual" for the sake of argument—"a single human being" or "a private or natural person"—Blake's use of a pseudonym does not make her any less an "individual described in section 1114." Opening Br. 17–18 (internal quotation marks omitted). Blake was a federal employee and a "natural person" who testified at trial. She used a pseudonym while on the job pursuant to a statute and IRS rules allowing her to do so. *See* IRS Restructuring & Reform Act of 1998, Pub. L. No. 105–206, § 3706, 112 Stat.

8

685, 778 (1998); *see also Haber v. United States*, 823 F.3d 746, 755 n.6 (2d Cir. 2016);

*Sanders v. United States*, 53 F.3d 343 (Table), 1995 WL 257812, at *1 (10th Cir. 1995).

The pseudonym was a constant feature of her employment as a revenue officer. And it

identified her specifically—for example, it was the name on her badge and business cards.

Indeed, the pseudonym so identified Blake that she felt compelled to list it as a known alias

on a personal mortgage application. Blake did not hide from Reed her identity as an IRS

agent or that she was attempting to enforce federal tax laws against him. She hid only her

real name.

The use of a pseudonym is fundamentally different from the creation of a wholly

fictitious persona. For example, Reed relies on *United States v. Haas*, 986 F.3d 467 (4th

Cir. 2021), which concerned information about nonexistent children used to lure a suspect

during a sex-trafficking investigation. *See id.* at 472, 479–480. Interpreting a provision of

the Sentencing Guidelines, we noted that "the term 'individual'" as used there did not

"unambiguously include[] fictitious victims." *Id.* at 479 n.6. The problem for Reed, aside

from the different statutory context, is that Blake is a real person—and a real IRS agent—

working under an alias. She is no more fictitious than George Eliot or Mark Twain.

At best, Reed's argument amounts to a factual impossibility defense, which "exists

where the objective is proscribed by the criminal law but a factual circumstance unknown

to the actor prevents him from bringing it about." *United States v. Hamrick*, 43 F.3d 877,

885 (4th Cir. 1995) (internal quotation marks omitted). Reed doesn't dispute on appeal

that he attempted to file a false lien against the IRS agent who was working to collect his

overdue taxes; he simply argues that his mistake about her real name prevented him from

9

completing the crime.  But factual impossibility is not a defense to an attempt charge.  *See United States v. Williams*, 553 U.S. 285, 300 (2008); *Engle*, 676 F.3d at 420; *Hamrick*, 43 F.3d at 885.  So Reed's argument fails.[2]

Because the Government presented ample evidence to convict Reed of attempting to file a retaliatory false lien against Blake, we affirm his conviction on Count 1.

B.

The jury also convicted Reed on Count 2, which charged a violation of the so-called "Omnibus Clause" of 26 U.S.C. § 7212(a).  Specifically, the superseding indictment charged Reed with "corruptly . . . endeavor[ing] to obstruct or impede[] the due administration of" the Internal Revenue Code.  26 U.S.C. § 7212(a).  Reed argues his conviction cannot be squared with the Supreme Court's interpretation of the Omnibus Clause in *Marinello v. United States*, 138 S. Ct. 1101 (2018).  Again, we disagree.

Under *Marinello*, the Government had to prove that a "nexus" existed "between [Reed's] conduct and a particular administrative proceeding." *Id.* at 1109.  This is because the phrase "due administration of [the Tax Code]" in the Omnibus Clause, 26 U.S.C. § 7212(a), does not include "routine, day-to-day work carried out in the ordinary course by the IRS, such as the review of tax returns," *Marinello*, 138 S. Ct. at 1110.  Rather, the clause reaches specific interference with "targeted governmental tax-related proceedings,

---

[2] Reed asserts his argument is one of legal impossibility, but we are unconvinced. That defense "is available where the defendant's acts, even if fully carried out as intended, would not constitute a crime." *Hamrick*, 43 F.3d at 885.  Reed intended to file a false lien against the IRS agent who was attempting to collect his delinquent taxes.  If carried out as intended, that conduct would certainly fall within Section 1521.

such as a particular investigation or audit" or "other targeted administrative action." *Id.* at 1104, 1109; *see United States v. Prelogar*, 996 F.3d 526, 533–534 (8th Cir. 2021) (discussing *Marinello*); *United States v. Graham*, 981 F.3d 1254, 1258–1259 (11th Cir. 2020) (same).

Reed argues only that Blake's actions were routine IRS work and not the kind of targeted administrative action that *Marinello* requires. He does not contest the jury's finding that he corruptly endeavored to obstruct or impede Blake's administration of federal tax law. Nor does he challenge the jury instructions articulating the elements of the crime. We conclude that substantial evidence supported the jury's finding that Blake's enforcement efforts were a "particular administrative proceeding" such as "an investigation or audit" and not "routine day-to-day work carried out in the ordinary course of business by the IRS." J.A. 385–386 (jury instructions).

By the time Blake was assigned to Reed's case, the IRS's regular collection efforts had already failed, and the IRS had transferred Reed's case to a specialized division. In fact, the IRS had been trying to collect taxes from Reed for years. After being assigned to Reed's case, Blake completed "an analysis of the case," "[i]ssued correspondence to [Reed]," and "[t]ried to make field contact" by visiting Reed at home. J.A. 209. She then issued a notice of levy to Reed's employer, and when that produced no response, she traveled to West Virginia and personally visited the Holiday Lodge to serve a final demand that the hotel garnish Reed's wages. These efforts were far from routine IRS work carried out in the ordinary course and instead were a targeted investigation into and enforcement action against Reed's persistent refusal to pay taxes. *See Graham*, 981 F.3d at 1259

11

(upholding Section 7212(a) conviction for obstructing targeted IRS collection efforts that included assigning revenue officers to the case, issuing notices of levies, and seizing the defendant's property for resale).

In response, Reed raises several unpersuasive arguments. First, he contends Blake's work was routine because she did no investigation to determine "the nature or amount of the delinquency." Opening Br. 25. But the jury heard that Blake inherited Reed's case from other revenue officers who had made unsuccessful collection attempts for years. And Blake testified that she completed "a normal investigation" that included undertaking "an analysis of the case and all the actions that had taken place prior to [her] assignment." J.A. 209. Her analysis of the case and subsequent efforts to collect these past-due amounts can qualify as targeted administrative action without necessitating a recalculation of the delinquency. Second, Reed relies on Blake's trial testimony that garnishing wages was a part of her "day-to-day duties" and her "normal course of business." J.A. 268. Yet what constitutes routine work for an officer in a specialized division that handles difficult cases and repeat tax avoiders does not define what is routine for the whole agency.

Third, Reed cites data indicating that in 2020 and 2021, the IRS sent several hundred thousand notices of levy annually and argues this shows that garnishing wages is a routine, day-to-day IRS action. *See* IRS, *Internal Revenue Service Data Book, 2021* 59 (2022). However, data from the same years also shows the IRS received over 157 million individual income tax returns in 2020 and over 167 million such returns in 2021. *See id.* at 4–5. The vast disparity between the total numbers of individual returns and notices of levy rebuts Reed's argument that garnishments are akin to "routine administrative

12

procedures that are near-universally applied to all taxpayers." *Marinello*, 138 S. Ct. at 1104. Finally, Reed points out that the IRS did not seize any of his property for resale. But neither *Marinello* nor the jury instructions in this case require such a seizure in order to bring an administrative action within the Omnibus Clause of Section 7212(a). Accordingly, we affirm Reed's conviction on Count 2.

III.

Reed also challenges his sentence on appeal, disputing the district court's application of three sentencing enhancements. In assessing whether a sentence is procedurally unreasonable because of a misapplication of the Guidelines, we review the district court's legal conclusions de novo and factual findings for clear error. *See United States v. Morehouse*, 34 F.4th 381, 387 (4th Cir. 2022). "'Where a Guidelines application involves a mixed question of law and fact, the applicable standard turns on the nature of the circumstances at issue.'" *United States v. Dodd*, 770 F.3d 306, 309 (4th Cir. 2014) (quoting *United States v. Adepoju*, 756 F.3d 250, 256 (4th Cir. 2014)). "If the application turns on a question of fact, the clear error standard applies; if it turns on a legal interpretation, de novo review is appropriate." *Id.*; *see Adepoju*, 756 F.3d at 256 ("If the application is 'essentially factual,' we apply the clearly erroneous standard." (quoting *United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir. 1989))).

Reed first argues the district court erroneously applied a six-level enhancement to Count 1 under U.S.S.G. § 2A6.1(b)(1). That Guideline, which applies to "threatening or harassing communications," "hoaxes," and "false liens," calls for a six-level increase "[i]f the offense involved any conduct evidencing an intent to carry out such threat." U.S.S.G.

13

§ 2A6.1(b)(1).  The word "threat" in Section 2A6.1(b)(1) has "the same meaning" as in "statutes criminalizing threats."  *United States v. Spring*, 305 F.3d 276, 280 (4th Cir. 2002).  "The pivotal inquiry" for application of the enhancement "is into the defendant's intent and the likelihood that the defendant would carry out the threat," as evidenced by "any acts" demonstrating such an intent.  *United States v. Worrell*, 313 F.3d 867, 876 (4th Cir. 2002) (internal quotations marks and brackets omitted); *see United States v. Spencer*, 628 Fed. App. 867, 869 (4th Cir. 2015).  Relevant conduct includes "both conduct that occurred prior to the offense and conduct that occurred during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole."  U.S.S.G. § 2A6.1 cmt. n.1.[3]

The district court applied Section 2A6.1(b)(1) because Reed sent "courtesy notices" to various IRS officials advising them of legal action he was initiating against Blake and demonstrated his intent to carry out those threats by actually filing the false lien and related financing statement.  In support, the court relied on *United States v. Jordan*, in which the Fifth Circuit upheld application of the same enhancement to a conviction under Section 1521 for filing false liens against a judge and prosecutor after threatening to do so.  851 F.3d at 395–396, 401–402.

---

[3] Citing *United States v. Campbell*, 22 F.4th 438 (4th Cir. 2022), Reed claims this commentary is inconsistent with the Guideline's text and therefore inapplicable.  But we considered and rejected a similar argument in *United States v. Worrell*, 313 F.3d 867, 877–878 (4th Cir. 2002).  Reed does not cite *Worrell*, much less explain why we should deviate from that decision here.

14

We find no clear error in the district court's essentially factual determination that Reed's actions justified the enhancement. Reed's "courtesy notices" to IRS officials arguably constituted threats to initiate legal action against Blake to attempt to take her property. And Reed's public filing of the lien and financing statement were overt acts that demonstrated his intent to carry out the threat if Blake did not halt her collection efforts against him. As Reed told the Treasury Department investigators, he believed "he could enforce [the lien] at any time" and that it "would not go away without him signing off or making [it] go away." J.A. 152. Reed's counterargument that he was not convicted for making threats is unpersuasive because, as the Guideline commentary explains, the enhancement includes "prior acts of threatening the victim that have a substantial and direct connection to the offense." U.S.S.G. § 2A6.1 cmt. n.1.

Next, Reed contends the district court erred by applying an eight-level enhancement to Count 2 for "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). The Sentencing Commission included "property damage" in the enhancement "to address cases in which property damage is caused or threatened as a means of intimidation or retaliation." *Id.* § 2J1.2 cmt. n.5. The district court determined that the lien Reed filed against Blake and Nelson threatened "property damage" under the Guideline because the lien purported to create a property right adverse to their ownership of their real and personal property in order to interfere with and obstruct Blake's enforcement of the tax laws. *See Reed*, 668 F.3d at 982. On appeal, Reed asserts that a lien does not damage property, especially where, as here, it does not actually encumber particular property.

15

We find no reversible error in the district court's analysis. Although Section 2J1.2(b)(1)(B) requires any personal injury to be "physical," the Guideline does not limit the term "property damage" in the same way. And the Guideline explicitly encompasses "threatening" to cause property damage. Thus, we will not disturb the district court's determination that, by filing a lien against Blake's and Nelson's property, Reed "caus[ed] or threaten[ed] to cause" damage to their property. *See Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 198 (2007) ("[A] lien has an immediate adverse effect upon the amount which could be received on a sale, constituting a direct interference with the property." (internal quotation marks, brackets, and ellipses omitted)); *United States v. Small*, 618 Fed. App. 870, 871 (7th Cir. 2015) (reasoning that a threat to file a lien was "an expressed intent to harm property").

Finally, Reed contends the district court erred by applying a two-level enhancement to Count 2 for conduct "otherwise extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3)(C). Several factors may be relevant to that assessment, "'including the length and scope of the criminal activity as well as the number of persons involved.'" *United States v. Pegg*, 812 Fed. App. 851, 860 (11th Cir. 2020) (quoting *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994)). The district court relied on Reed's efforts to convince Nelson not to garnish his wages, his numerous frivolous legal filings in multiple States, and his "campaign of serving notarized documents on Blake" purporting to show she "personally wronged him" and owed him "millions of dollars." J.A. 557–558. Although Reed cites cases suggesting his conduct was less extensive than some other defendants who received the same enhancement, the district court's reasoning does not

16

leave us with a "definite and firm conviction that a mistake has been committed." *United States v. Harvey*, 532 F.3d 326, 337 (4th Cir. 2008) (internal quotation marks omitted).[4] Thus, we affirm the district court's application of the challenged sentencing enhancements.

IV.

Upon review, we find no reason to disturb the jury's verdict in this case or the district court's application of the Sentencing Guidelines. Accordingly, the judgment of the district court is

*AFFIRMED*.

---

[4] We also note that, because we affirm the Section 2J1.2(b)(1)(B) enhancement, any error under subsection (b)(3)(C) is harmless. Removing the two-level enhancement would still leave Reed's Guidelines range on Count 2 above the statutory maximum and therefore not call into question his statutory-maximum sentence on that count. *See United States v. Kobito*, 994 F.3d 696, 700, 704 (4th Cir. 2021) (holding that the proper application of one enhancement rendered any error in the application of another harmless "because, even without that enhancement, the statutory maximum would cap the Guidelines range").